636 S.E.2d 598

Allen SLOAN, M.D.; Doctor's Care, P.A.; Barry E. Fitch, P.T.; Jerry O'Reilly, P.T.A.; Oaktree Medical Centre, P.C.; FirstChoice Healthcare, P.C.; Southern Orthopaedic Sports Medicine, LLC; and South Carolina Medical Association, Plaintiffs,

Of Whom Doctor's Care, P.A.; Barry E. Fitch, P.T.; Jerry O'Reilly, P.T.A.; Oaktree Medical Centre, P.C.; FirstChoice Healthcare, P.C.; and Southern Orthopaedic Sports Medicine, LLC, are, Appellants,

v.

SOUTH CAROLINA BOARD OF PHYSICAL THERAPY EXAMINERS; South Carolina Chapter, American Physical Therapy Association; and the Attorney General of the State of South Carolina, Respondents,

and

South Carolina Association of Medical Professionals and South Carolina Orthopaedic Association, Appellants,

v.

South Carolina Board of Physical Therapy Examiners, Respondent.

No. 26209.

Supreme Court of South Carolina.

Heard June 7, 2006.

Decided Sept. 25, 2006.

Rehearing Denied Nov. 13, 2006.

454

456

460

James G. Long, III, and Manton M. Grier, Jr., both of Nexsen Pruet Adams Kleemeier, L.L.C., of Columbia, for Appellants Doctors Care, P.A.; Barry E. Fitch, P.T.; Jerry O'Reilly, P.T.A.; Oaktree Medical Centre, P.C.; FirstChoice Healthcare, P.C.; and Southern Orthopaedic Sports Medicine, LLC.

Stephen P. Bates and Mary Margaret Hyatt, both of McAngus, Goudelock & Courie, L.L.C., of Columbia, for Appellants South Carolina Association of Medical Professionals and South Carolina Orthopaedic Association.

Monteith P. Todd of Sowell Gray Stepp & Laffitte, L.L.P., of Columbia, for Respondent South Carolina Board of Physical Therapy Examiners.

R. Bruce Shaw and Alice V. Harris, both of Nelson Mullins Riley & Scarborough, L.L.P., of Columbia, for Respondent South Carolina Chapter, American Physical Therapy Association.

Henry D. McMaster, T. Stephen Lynch, Robert D. Cook, and C. Havird Jones, all of the South Carolina Office of Attorney General, of Columbia, for Respondent Attorney General of the State of South Carolina.

Charles E. Carpenter, Jr., and Carmen V. Ganjehsani, both of Richardson, Plowden, Carpenter & Robinson, P.A., of Columbia, for Amicus Curiae American Association of Orthopaedic Surgeons.

William J. Watkins, Jr., and Sandra L.W. Miller, both of Womble Carlyle Sandridge & Rice, L.L.C., of Greenville, for Amicus Curiae William Davis, Barry Cohen, Bruce Carlson, and George Todd.

Justice BURNETT:

In this appeal, we are asked to decide the novel issue of whether a physical therapist in South Carolina is statutorily prohibited from working as an employee of a physician who refers patients to the physical therapist for services.

## FACTUAL AND PROCEDURAL BACKGROUND

The arrangement at issue, known within the medical profession as a physician-owned physical therapy service, or POPTS, has generated debate nationwide since the mid–1970s. The debate is driven in part by money, *i.e.*, whether physicians or physical therapists will primarily benefit from fees paid by therapy patients, and in part by ethical concerns about actual and potential conflicts of interest. The debate also implicates issues of control and prestige among medical professionals. Two position statements from leading organizations on both sides of the issue offer a beneficial summary of the concerns.

The American Physical Therapy Association (APTA) opposes physician-owned physical therapy services.

Physical therapy referral for profit describes a financial relationship in which a physician, podiatrist, or dentist refers a patient for physical therapy treatment and gains financially from the referral. A physician can achieve financial gains from referral by (a) having total or partial ownership of a physical therapy practice, (b) directly employing physical therapists, or (c) contracting with physical therapists. The most common form of referral for profit relationship in physical therapy is the physician-owned physical therapy service, known by the acronym "POPTS." The problem of physician ownership of physical therapy services was first identified by the physical therapy profession in the journal *Physical Therapy* in 1976. While POPTS relationships were still limited in number in 1982, Charles Magistro, former APTA President, characterized POPTS as, "a cancer eating away at the ethical, moral and financial fiber of our profession."

For many years, the [APTA] has opposed referral for profit and physician ownership of physical therapy services, taking the position that such arrangements pose an inherent conflict of interest impeding both the autonomous practice of the physical therapist and the fiduciary relationship between the therapist and patient.... However, in recent years, facing pressures of decreasing revenues and increased costs of malpractice insurance premiums, and aided by weakening of federal antitrust legislation, physicians have accelerated the addition of POPTS to their practice. APTA's push to

achieve autonomous practice and direct access are in conflict with the medical profession's renewed push to subsume physical therapy as an ancillary service for financial gain.

At the center of the clash between these two opposing forces are two questions: First, should one profession be able to claim financial control over another? Second, what are the real and potential consequences of referral-for-profit relationships and, more specifically, POPTS?

"Position on Physician–Owned Physical Therapy Services (POPTS)," An American Physical Therapy Association White Paper 1 (January 2005) (available at http://www.aptaco.org/POPTSWhitePaperfinal.pdf) (footnotes omitted).

In its position statement, the APTA asserts that a physical therapist employed by a physician creates an inevitable conflict of interest, results in a loss of consumer choice in selecting a therapist, and drives up health care costs because physicians in self-referral relationships prescribe or continue therapy based more on financial gain than patient needs. "Having a financial interest in other services to which a physician refers a client may cloud the physician's judgment as to the need for the referral, as well as the length of treatment required. Similarly, the physical therapist employed by a physician may face pressure to evaluate and treat all patients referred by the physician, without regard to the patient's needs." APTA White Paper, *supra*, at 3.

In contrast, the American Association of Orthopaedic Surgeons (AAOS) views physical therapy as an ancillary service offered by physicians and contends POPTS benefit patients, physicians, and therapists.

POPTS gives physicians a greater role in the physical therapy services provided to patients. In-office therapy allows therapists and physicians to work together as a team, exchanging information and sharing ideas. The frequency and immediacy of feedback allow for the fine-tuning of therapeutic protocols that serves to improve patient outcomes. A study comparing on-site physical therapy delivered in physician offices versus other sites concluded that patients who receive on-site physical therapy lose less time from work and resume normal duties more quickly.

Frequent and timely feedback between therapists and physicians also reduces over-utilization of services. . . . [T]he ability to exchange information on a patient in a frequent and timely fashion serves to reduce errors. . . .

POPTS offers patients direct and immediate access to Physical Therapists after the physician has seen them. Moreover, patients have the ability to schedule physician and physical therapy appointments at or near the same time and in the same office. . . .

Recently, there have been attempts by some groups to add language, as well as interpret existing statutory language, to state Physical Therapy Practice Acts that would prohibit Physical Therapists from working for physicians and physician group practices. These activities seem to be motivated more by the financial interests of those providing care than by what is in the best interests of patients. . . .

The [AAOS] believes that patients should have access to quality, comprehensive and non-fragmented care. Doctors, nurses, physician's assistants, Physical Therapists and other health practitioners work together, often in the same office, to provide comprehensive care to patients. Separation of these services would only serve to disrupt a patient's treatment and further inconvenience them.

"Position Statement on Physician–Owned Physical Therapy Services," American Association of Orthopaedic Surgeons (December 2004) (available at http://www.aaos.org/wordhtml/papers/position/1166.htm) (footnotes and bold/italic fonts omitted). An amicus brief filed by the AAOS in the present case echoes these same arguments and recites portions of the group's position statement.

Congress engaged in a similar debate in recent years, resulting in the enactment in 1989 and 1993 of the federal self-referral "Stark laws," named for their primary sponsor, Congressman Fortney "Pete" Stark. These provisions generally prohibit, with limited exceptions, physicians from referring patients to various types of facilities in which they are owners or investors, including clinical laboratories, centers with medical scanning equipment, and physical and radiation therapy facilities. The acts were "designed to address the strain placed on the Medicare Trust fund by the overutilization of

certain medical services by physicians who, for their own financial gain rather than their patients' medical need, referred patients to entities in which the physicians held a financial interest." *American Lithotripsy Soc. v. Thompson,* 215 F.Supp.2d 23, 26–28 (D.D.C.2002) (discussing enactment and purposes of Stark laws, codified at 42 U.S.C. § 1395nn); *Eighty–Four Min. Co. v. Three Rivers Rehabilitation, Inc.,* 554 Pa. 443, 721 A.2d 1061, 1063–67 (1998) (discussing interplay between federal and state self-referral statutes in context of a worker's compensation case involving physical therapy services).

South Carolina's Legislature in 1993 enacted the "Provider Self–Referral Act," codified at South Carolina Code Ann. §§ 44–113–10 to –80 (2002). This Act generally prohibits a health care provider from referring a patient to an entity in which the provider has an investment interest, with certain exceptions and disclosure requirements, and also prohibits a health care provider from accepting a kickback for patient referrals.

In 1998, the Legislature substantially amended various statutes governing the licensing and regulation of physical therapists. Act No. 360, 1998 S.C. Acts 2103–2119 (presently codified at S.C.Code Ann. §§ 40–45–5 to –330 (2001)). Among the amendments was a new provision contained in Section 40–45–110(A)(1), which states:

> (A) In addition to the other grounds provided for in Section 40–1–110,[1] the [South Carolina Board of Physical Therapy Examiners], after notice and hearing, may restrict or refuse to renew the license of a licensed person, and may suspend, revoke, or otherwise restrict the license of a licensed person who:
>
> > (1) requests, receives, participates or engages directly or indirectly in the dividing, transferring, assigning, rebating, or refunding of fees received for professional services or profits by means of a credit or other valuable consideration, including, but not limited to, wages, an unearned

---

1. This statute lists other grounds for which an individual's professional license may be suspended or revoked by a licensing board, such as committing fraud in obtaining the license or in the individual's practice, being convicted of a felony crime, or suffering a physical or mental disability which renders further practice dangerous to the public.

commission, discount, or gratuity with a person who referred a patient, or with a relative or business associate of the referring person; . . .

In December 1998, seven months after the effective date of the new statute, the South Carolina Board of Physical Therapy Examiners (Board) issued a written statement:

It is the Board's position that physical therapists and physical therapist assistants involved in the practice settings that comply with state and federal laws regarding physician or provider referral to practices in which they have an ownership interest should not be subject to discipline. The Board does have the intention to further clarify this section of the statutes in regulation at a later date.

From 1998 to 2004, for reasons not apparent from the record, the Board did not attempt to apply the new statute to prevent a physical therapist from working for or receiving referrals from a physician employer.[2]

In 2004, at the suggestion of the South Carolina chapter of the American Physical Therapy Association (SCAPTA), two state senators requested an opinion from the Attorney General regarding the scope and interpretation of Section 40–45–110(A)(1). Specifically, the senators inquired whether the statute prohibited a physical therapist from working for pay for a physician employer when the physician refers patients to the physical therapist for services. The Attorney General issued an opinion concluding the statute prohibited such employment relationships, relying in part on legal authority called to the Attorney General's attention by APTA's general counsel. S.C. Atty. Gen. Op. dated March 30, 2004 (2004 WL 736934).

The Board, following discussion of the issue and a vote at a regularly scheduled meeting, endorsed the Attorney General's opinion and announced it would begin investigating complaints against physical therapists employed by referring physicians. The Board granted a ninety-day grace period during which

---

2. We have used only the term "physician" for purposes of clarity, but that term also includes a physician or group practice of physicians established in a corporate form, such as a professional corporation or professional association. Similarly, use of the term "physical therapist" includes "physical therapist assistant."

physical therapists and physicians could modify or terminate arrangements in violation of the statute.

Appellants, who are physicians and physical therapists they employ opposed to the Board's decision, brought an action in circuit court seeking a declaratory judgment that a physician may lawfully employ a physical therapist and refer patients to that physical therapist. Appellant physicians asserted they stand to lose substantial sums they have spent to purchase equipment, prepare facilities, and hire physical therapists. SCAPTA and the Attorney General sought to intervene in the lawsuit and their motions were granted.

Two other Appellants, the South Carolina Association of Medical Professionals and the South Carolina Orthopaedic Association brought a separate declaratory judgment action against the Board, but also alleged equal protection and due process violations. The two cases were consolidated on the motion of these Appellants. Respondents include the Board, SCAPTA, and the Attorney General.

The parties filed respective motions for summary judgment. The circuit court denied Appellants' motions for summary judgment and granted Respondents' motions, ruling that a physical therapist is statutorily prohibited from working as an employee of a physician who refers patients to the physical therapist for services. The circuit court dismissed all Appellants' causes of action and lifted a temporary injunction previously entered which had barred the Board from taking action against physical therapists believed to be in violation of the statute. We certified this case for review from the Court of Appeals pursuant to Rule 204(b), SCACR.

## STANDARD OF REVIEW

■ In a case raising a novel question of law regarding the interpretation of a statute, the appellate court is free to decide the question with no particular deference to the lower court. *I'On, L.L.C. v. Town of Mt. Pleasant,* 338 S.C. 406, 411, 526 S.E.2d 716, 719 (2000) (citing S.C. Const. art. V, §§ 5 and 9; S.C.Code Ann. §§ 14–3–320 and –330 (1976 & Supp.2005), and S.C.Code Ann § 14–8–200 (Supp.2005)); *Osprey, Inc. v. Cabana Ltd. Partnership,* 340 S.C. 367, 372, 532 S.E.2d 269, 272 (2000) (same); *Clark v. Cantrell,* 339 S.C. 369, 378, 529 S.E.2d

528, 533 (2000) (same). The appellate court is free to decide the question based on its assessment of which interpretation and reasoning would best comport with the law and public policies of this state and the Court's sense of law, justice, and right. *Croft v. Old Republic Ins. Co.*, 365 S.C. 402, 408, 618 S.E.2d 909, 912 (2005); *Antley v. New York Life Ins. Co.*, 139 S.C. 23, 30, 137 S.E. 199, 201 (1927) ("In [a] state of conflict between the decisions, it is up to the court to 'choose ye this day whom ye will serve'; and, in the duty of this decision, the court has the right to determine which doctrine best appeals to its sense of law, justice, and right.").

 A trial court may properly grant a motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), SCRCP; *Tupper v. Dorchester County*, 326 S.C. 318, 487 S.E.2d 187 (1997). In determining whether any triable issues of fact exist, the court must view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the non-moving party. *Manning v. Quinn*, 294 S.C. 383, 365 S.E.2d 24 (1988). On appeal from an order granting summary judgment, the appellate court will review all ambiguities, conclusions, and inferences arising in and from the evidence in a light most favorable to the appellant, the non-moving party below. *Williams v. Chesterfield Lumber Co.*, 267 S.C. 607, 230 S.E.2d 447 (1976).

## ISSUES

I. Does South Carolina Code Ann. § 40–45–110(A)(1) (2001) prohibit a physical therapist from working as an employee of a physician when the physician refers patients to the physical therapist for services?

II. Does the Board's decision to begin enforcing Section 40–45–110(A)(1) after formally endorsing an opinion issued by the Attorney General regarding the proper interpretation of the statute constitute a new regulation that is void for failure to comply with the rule-making provisions of the state Administrative Procedures Act?

III. Does the Board's decision to enforce Section 40–45–110(A)(1) improperly infringe upon physicians' statutory right to practice medicine?

IV. Does Section 40–45–110(A)(1) violate the equal protection rights of physical therapists who wish to be employed by physicians who refer patients to them?

V. Does Section 40–45–110(A)(1) violate the substantive or procedural due process rights of physical therapists who wish to be employed by physicians who refer patients to them?

## LAW AND ANALYSIS

### I. INTERPRETATION OF SECTION 40–45–110(A)(1)

Appellants contend the circuit court erred in interpreting Section 40–45–110(A)(1) to prohibit physical therapists from working as an employee of a physician when the physician refers patients to the physical therapist for services. Appellants argue that, while the statute plainly is intended to prohibit kickbacks in which a therapist pays a physician for a referral, the Legislature did not intend to ban physical therapists from being employed by referring physicians.[3] We disagree.

 It is a cardinal rule of statutory construction that the primary purpose in interpreting statutes is to ascertain the intent of the Legislature. *Hodges v. Rainey,* 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000); *State v. Martin,* 293 S.C. 46, 358 S.E.2d 697 (1987). When a statute's terms are clear and unambiguous on their face, there is no room for statutory construction and a court must apply the statute according to its literal meaning. *Carolina Power & Light Co. v. City of Bennettsville,* 314 S.C. 137, 139, 442 S.E.2d 177, 179 (1994).

 A statute as a whole must receive practical, reasonable, and fair interpretation consonant with the purpose, design, and policy of lawmakers. The real purpose and intent of the lawmakers will prevail over the literal import of particular words. *Browning v. Hartvigsen,* 307 S.C. 122, 125, 414 S.E.2d

---

3. The AAOS and four patients who received therapy from physical therapists employed by physicians have filed two amicus briefs in support of Appellants' position.

115, 117 (1992); *Caughman v. Columbia Y.M.C.A.*, 212 S.C. 337, 341, 47 S.E.2d 788, 789 (1948). Words must be given their plain and ordinary meaning without resort to subtle or forced construction to limit or expand the statute's operation. *Bryant v. City of Charleston*, 295 S.C. 408, 368 S.E.2d 899 (1988); *State v. Blackmon*, 304 S.C. 270, 273, 403 S.E.2d 660, 662 (1991). The construction of a statute by an agency charged with its administration is entitled to the most respectful consideration and should not be overruled absent compelling reasons. *Emerson Elec. Co. v. Wasson*, 287 S.C. 394, 397, 339 S.E.2d 118, 120 (1986).

■ We conclude Section 40–45–110(A)(1) prohibits a physical therapist from receiving referrals from or dividing fees with a physician employer. The statute allows the Board to suspend, restrict, or revoke the license of a physical therapist who "requests, receives, participates or engages directly or indirectly in the dividing, transferring, assigning, rebating, or refunding of fees received for professional services or profits by means of a credit or other valuable consideration, including, but not limited to, wages, an unearned commission, discount, or gratuity with a person who referred a patient, or with a relative or business associate of the referring person."

A physical therapist employed by a physician who refers patients to the therapist is, in essence, dividing, transferring, or assigning "fees received for professional services or profits" with the referring physician. Moreover, the statute specifically lists "wages" as a form of valuable consideration by which a physical therapist may not, directly or indirectly, divide, transfer, assign, or refund professional fees with a person who refers patients to the therapist. Although we lack the benefit of any legislative history explaining the Legislature's specific motivation for enacting this statute, it is no great stretch to conclude the statute was passed for the same reasons which prompted enactment of the state Provider Self–Referral Act and the federal Stark laws—to protect consumers as well as government-sponsored health care programs such as Medicare and Medicaid from actual and potential conflicts of interest which are likely to lead to overuse of medical services by physicians who, for their own financial gain rather than their patients' medical needs, refer patients to entities in which the physicians hold a financial interest.

Appellants urge us to look beyond Section 40–45–110(A)(1) to deduce the Legislature's intention. They point to South Carolina Code Ann. § 44–113–20(12) (2002), a provision of the Provider Self–Referral Act, which they contend defines a prohibited "referral" only as sending patients "outside" a healthcare practice. Thus, Appellants argue, in-house referrals like the ones between a physician and his physical therapist-employee are permissible.

■■ The Provider Self–Referral Act applies to physicians and physical therapists. *See* S.C.Code Ann. § 44–113–20(8) (2002) (defining "health care provider" or "health care professional" as a "person licensed, certified, or registered under the laws of this State to provide health care services") and § 44–113–20(2) (2002) (defining "[c]omprehensive rehabilitation services" as "services that are provided by health care professionals licensed under [various chapters of Title 40] to provide speech, occupational, or physical therapy services on an outpatient or ambulatory basis").

Appellants correctly state it is well-settled that statutes dealing with the same subject matter are *in pari materia* and must be construed together, if possible, to produce a single, harmonious result. *Joiner ex rel. Rivas v. Rivas*, 342 S.C. 102, 536 S.E.2d 372 (2000). However, it is not necessary to apply this rule when the meaning of a particular statute is clear and unambiguous. *Rabon v. S.C. State Hwy. Dept.*, 258 S.C. 154, 157, 187 S.E.2d 652, 654 (1972).

■■ Appellants' argument are unpersuasive for two reasons. First, it is not necessary to apply the definition of "referral" from the Provider Self–Referral Act to the interpretation of Section 40–45–110(A)(1). The term "refer" as used in the statute should be interpreted according to its plain meaning, which in this instance is "to send or direct for treatment, aid, information, [or] decision, [*e.g.,*] a patient to a specialist." *Webster's Third New International Dictionary* 1907 (1981).

Second, and more importantly, the provision of the Provider Self–Referral Act cited by Appellants actually defines the term "referral" according to its plain and ordinary meaning and, in fact, does not draw a distinction between "outside" and "in-house" referrals as Appellants contend. Section 44–113–20(12) defines a referral as follows:

"Referral" means a referral of a patient by a health care provider for health care services including, but not limited to:

(a) the forwarding of a patient by a health care provider to another health care provider *or* to an entity outside the health care professional's office or group practice which provides or supplies designated health services or any other health care item or service; or

(b) the request or establishment of a plan of care by a health care provider, which includes the provision of a designated health service or any other health care item or service outside the health care professional's office or group practice. (Emphasis added.)

▆▆▆ Appellants' interpretation of subsection (a) to allow in-house referrals is incorrect. A referral includes "the forwarding of a patient by a health care provider to another health care provider"—who could be inside or outside the referring provider's practice—"*or* to an entity outside the health care professional's office or group practice...."

Next, Appellants argue that employment relationships between physicians and physical therapists are permitted pursuant to provisions of the Provider Self–Referral Act,[4] federal Anti–Kickback statutes,[5] and the federal Stark laws.[6] Appel-

---

**4.** S.C.Code Ann. § 44–113–30(A)(1) (2002) (prohibition on referrals does not apply to "an investment interest where the health care professional directly provides the health care services within the entity or will be personally involved in the provision, supervision, or direction of care to the referred patient").

**5.** 42 U.S.C.A. §§ 1320a–7a to 7d (2003 & Supp.2005) (establishing criminal and civil penalties for false claims and illegal kickbacks made under federal health care programs such as Medicare and Medicaid); 42 C.F.R. § 1001.952(i) (2005) (providing that prohibited " 'remuneration' does not include any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment in the furnishing of any item of service for which payment may be made" under federal health care programs).

**6.** 42 U.S.C.A. § 1395nn(e)(2) (Supp.2005) (establishing exception to self-referral statute for "any amount paid by an employer to a physician (or an immediate family member of such physician) who has a bona fide employment relationship with the employer" if certain requirements are met). *See also U.S. ex rel. Obert–Hong v. Advocate Health Care,* 211 F.Supp.2d 1045, 1050 (N.D.Ill.2002) (observing that the

lants contend these laws were aimed at eliminating misjudgments clouded by the financial incentive physicians would have when referring patients to facilities in which the physician has an ownership interest, yet the laws do not prohibit physicians from directly employing physical therapists. Assuming, without deciding, that these statutes allow an employer-employee relationship between physicians and physical therapists, this fact is immaterial in interpreting Section 40–45–110(A)(1), which the circuit court correctly interpreted to prohibit such relationships. The Legislature is free to further restrict such relationships regardless of a related state statute or federal laws, absent any issue of federal preemption, which is not implicated in the present case.

Next, Appellants assert that the Board's interpretation of Section 40–45–110(A)(1) for six years to allow physicians to employ physical therapists should be given due consideration. The record contains no evidence of the extent of the Board's debate about the proper interpretation of the statute. The Board in its 1998 position statement permitted existing arrangements to continue until the Board chose to further clarify the matter, which it eventually did. The record does not reveal why the Board failed to properly interpret and enforce the statute from 1998 to 2004. Regardless, the Board now has decided to enforce the statute in a manner which accurately reflects legislative intent. The Board's previous inaction and lack of enforcement shed no light on the statute's interpretation.

Finally, Appellants point to a 1997 memorandum from the Board to state senators discussing proposed statutory amendments and the title of the 1998 Act amending provisions related to physical therapists, which Appellants attempt to present as a form of legislative history. The Board's memorandum stated Section 40–45–110 would "add[ ] grounds for disciplinary action against physical therapists and physical therapist assistants who participate in a referral for profit practice." The title of Act No. 360 states the Act would "further provide for the licensure and regulation of physical

---

"Stark and Anti-Kickback statutes are designed to remove economic incentives from medical referrals, not to regulate typical hospital-physician employment relationships. Both statutes explicitly include employee exceptions.").

therapists, including ... prohibiting, receiving, or in any way participating in refunding fees for patient referrals." 1998 S.C. Acts at 2103.[7] Appellants contend the Board's memorandum and the Act's title indicate the amendment was intended only to prohibit referrals for pay, not bar employment relationships.

Neither the Board's memorandum nor the Act's title support Appellants' argument. The language in the items certainly indicates an intention to prohibit referrals for pay, i.e., kickbacks, but the language does not conflict with an interpretation of the statute which also prohibits employment relationships between physicians and physical therapists. Moreover, while an act's title should accurately describe various provisions, by definition it is a summary and not a complete description of every provision contained in a particular bill. See e.g. Sloan v. Wilkins, 362 S.C. 430, 438, 608 S.E.2d 579, 583 (2005) (purposes of constitutional provision on titles of legislative acts are to apprise legislators of the contents of an act by reading the title, prevent legislative logrolling in which several distinct matters are embraced in one bill in order to obtain passage by a combination of the minorities in favor of each measure into a majority that will adopt them all, and inform the public of matters with which the General Assembly concerns itself).

Accordingly, we conclude the circuit court correctly interpreted Section 40–45–110(A)(1) to prohibit a physical therapist from working as an employee of a physician when the physician refers patients to the physical therapist for services.

## II. FAILURE OF THE BOARD TO COMPLY WITH RULE–MAKING PROVISIONS OF THE APA

Appellants argue the Board's decision to begin enforcing Section 40–45–110(A)(1) after formally endorsing an opinion issued by the Attorney General constitutes a new regulation that is void for failure to comply with the rule-making provisions of the state Administrative Procedures Act (APA). Appellants assert the Board's formal endorsement of the Attorney General's opinion regarding the interpretation of the

7. The title of Act No. 360 is essentially the same as the title of House Bill No. 3784 of the 1997–98 legislative session cited by Appellants.

statute constitutes a regulation under the "binding norm" test adopted by this Court. We disagree.

Under the APA, a

"[r]egulation" means each agency statement of general public applicability that implements or prescribes law or policy or practice requirements of any agency. Policy or guidance issued by an agency other than in a regulation does not have the force or effect of law. The term "regulation" includes general licensing criteria and conditions and the amendment or repeal of a prior regulation, but does not include descriptions of agency procedures applicable only to agency personnel; opinions of the Attorney General; ... [listing various other matters not pertinent in this appeal] ... advisory opinions of agencies; and other agency actions relating only to specified individuals.

S.C.Code Ann. § 1–23–10(4) (2005).

In order to promulgate a regulation, the APA generally requires a state agency to give notice of a drafting period during which public comments are accepted on a proposed regulation; conduct a public hearing on the proposed regulation overseen by an administrative law judge or an agency's governing board; possibly prepare reports about the regulation's impact on the economy, environment, and public health; and submit the regulation to the Legislature for review, modification, and approval or rejection. *See* S.C.Code Ann. §§ 1–23–110 to –160 (2005 & Supp.2005). It is undisputed that the Board did not follow this process in issuing its 1998 statement or in endorsing the Attorney General's opinion in 2004.

The Board's formal endorsement of the Attorney General's interpretation of the statute was nothing more than a policy or guidance statement which does not have the force or effect of law in any individual case. The Board's statement regarding its interpretation of Section 40–45–110(A)(1) is not a regulation or the equivalent of a regulation. The Board stated in 2004, in essence, "This interpretation is what we believe the law means and we direct our staff to enforce it accordingly, beginning ninety days after our vote today."

The Board's pronouncement did not implement or prescribe the law or practice requirements for physical therapists in

more detail than set forth by statute; the pronouncement simply adopted an interpretation of the statute which the Board intended to begin enforcing. To hold otherwise would lead to the absurd result that, before an agency may enforce a statute, it would have to enact a regulation explaining its interpretation and application of the statute in detail and its intention of enforcing it. The agency would be required to return to the Legislature seeking approval of a regulation which interpreted the legislative pronouncement and permission to enforce it. Neither the APA's rule-making provisions for regulations nor our precedent requires such a step.

Appellants' reliance on the "binding norm" test discussed in *Home Health Service, Inc. v. South Carolina Tax Commission*, 312 S.C. 324, 440 S.E.2d 375 (1994) is misplaced because there clearly is no binding norm contained in the Board's pronouncement. In *Home Health Service*, the Tax Commission relied on an internal memorandum which interpreted bingo statutes to prohibit a bingo operator's employees from marking cards for a player while the player was temporarily absent from a game. The memorandum had been circulated among Tax Commission offices, but had not been published in the form of a regulation. We explained that

[w]hether a particular agency proceeding announces a rule or a general policy statement depends upon whether the agency action establishes a binding norm.... In our view, the document issued was similar to a policy statement as opposed to a binding norm given that the document was not issued by the commissioners and thus, no final agency approval had been given. Therefore, we do not find that the APA was violated in this instance. We caution respondent that when there is a close question whether a pronouncement is a policy statement or regulation, the commission should promulgate the ruling as a regulation in compliance with the APA.

*Id.* at 328–29, 440 S.E.2d at 378 (citation omitted).

 Under the line of federal cases we relied on in *Home Health Service*, courts have held that whether an agency's action or statement amounts to a rule—which must be formally enacted as a regulation—or a general policy statement—which does not have to be enacted as a regulation—depends

on whether the action or statement establishes a "binding norm." When the action or statement "so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion," then it is a binding norm which should be enacted as a regulation. But if the agency remains free to follow or not follow the policy in an individual case, the agency has not established a binding norm. *Ryder Truck Lines, Inc. v. U.S.*, 716 F.2d 1369, 1377–78 (11th Cir.1983) (citing cases).

The Board did not enact a binding norm by endorsing the Attorney General's opinion. That opinion merely sets forth the legal reasoning and authority the Attorney General used to interpret the statute. The Board in endorsing the opinion did not, for example, set forth a list of criteria to use in analyzing whether a particular employment relationship of a physician and physical therapist violated the statute. Again, the Board simply stated its position that employment relationships are prohibited by the statute and announced its intention of enforcing the prohibition. An agency is not required to enact a companion or explanatory regulation in order to enforce a statute.

■■■ We affirm the circuit court's ruling that the Board's decision to begin enforcing Section 40–45–110(A)(1) after formally endorsing an opinion issued by the Attorney General does not constitute a new regulation that is void for failure to comply with the rule-making provisions of the APA.

## III. INFRINGEMENT ON THE PRACTICE OF MEDICINE

Appellants argue the Board's decision to enforce Section 40–45–110(A)(1) improperly infringes upon physicians' statutory right to practice medicine as outlined in South Carolina Code Ann. §§ 40–47–5 to –1620 (2001 & Supp.2005). Specifically, Appellants rely on S.C.Code Ann. § 40–47–40 (2001), which they assert defines the practice of medicine to encompass the practice of physical therapy.[8] Therefore, the Board may not

---

8. Section 40–47–40 provides:

Any person shall be regarded as practicing medicine within the meaning of this article who (a) shall as a business treat, operate on or prescribe for any physical ailment of another, (b) shall engage in any

usurp physicians' authority by prohibiting them from employing physical therapists. We disagree.

▮ Appellants are correct to the extent they assert that the practice of medicine, pursuant to Section 40–47–40, encompasses the prescribing of physical therapy for a given injury or condition. In fact, physical therapists in South Carolina generally are prohibited from providing therapy to a patient without an order from a physician or dentist. *See* Section 40–45–110(A)(4) (the Board may suspend, restrict, or revoke the license of a physical therapist who, "in the absence of a referral from a licensed medical doctor or dentist, provides physical therapy services beyond thirty days after the initial evaluation and/or treatment date without the referral of the patient to a licensed medical doctor or dentist"); S.C.Code Ann. 40–45–310 (2001) ("Nothing in this chapter may be construed as authorizing a licensed physical therapist ... to practice medicine. ...").

▮ However, the general oversight of the administration of physical therapy by a physician does not mean a physician has an unfettered right to actually provide the therapy by directly employing physical therapists. Under Appellants' reasoning, a physician conceivably could assert the right to ignore any number of statutory restrictions or duties simply because the physician believes they either infringe on the right to practice medicine as the physician sees fit or improperly usurp the physician's power and authority.

▮ It is axiomatic that the Legislature has broad authority, within constitutional limits, to regulate the medical and other professions through the enactment of statutes and regulations. *See* S.C.Code Ann. § 40–1–10(A) (2001) (stating that right of person to engage in lawful profession or occupation is protected by state and federal constitutions, but the State may abridge that right through exercise of its police powers when necessary for the preservation of the health, safety, and

---

branch or specialty of the healing art or (c) shall diagnose, cure, relieve in any degree or profess or attempt to diagnose, cure or relieve any human disease, ailment, defect, abnormality or complaint, whether of physical or mental origin, by attendance or advice, by prescribing, using or furnishing any drug, appliance, manipulation, adjustment or method or by any therapeutic agent whatsoever.

welfare of the public). Title 40 contains some fifteen chapters regulating medical professionals such as physicians, dentists, pharmacists, nurses, physical therapists, and psychologists.

In *Dantzler v. Callison*, 230 S.C. 75, 94 S.E.2d 177 (1956), this Court upheld the constitutionality of a law making it illegal to practice naturopathy by anyone who failed to meet newly prescribed qualifications. The Court explained at length that

[t]here is no reasonable doubt that the rights of those who have been duly licensed to practice medicine or other professions are property rights of value which are entitled to protection ... and that the right of a person to practice his profession for which he has prepared himself is property of the very highest quality. However, it may be observed that no person has a natural or absolute right to practice medicine, surgery, naturopathy or any of the various healing arts. It is a right granted upon condition....

A state may not prohibit the practice of medicine or surgery, yet it is very generally held that a state, under its police power, may regulate, within reasonable bounds, for the protection of the public health the practice of either by defining the qualifications which one must possess before being permitted to practice the same ...

[T]he right to practice medicine is a qualified one and is held in subordination to the duty of the State under the police power to protect the public health....

No person can acquire a vested right to continue, when once licensed, in a business, trade or profession which is subject to legislative control and regulation under the police power, as regulations prescribed for such may be changed or modified by the legislature, in the public interest, without subjecting the action to the charge of interfering with contract or vested rights....

The granting of a license to practice certain professions is the method taken by the State, in the exercise of its police power, to regulate and restrict the activity of the licensee. [The licensee] takes the same, subject to the right of the State, at any time, for the public good to make further restrictions and regulations. It is a matter of common knowledge that derivatives of opium or similar drugs could

be purchased in former years at even a country store. The State has now prohibited this and a druggist may not sell morphine or drugs of that nature without a prescription from a duly licensed authority. If the restrictions are reasonable, they would be upheld even though they actually prohibit some people from further engaging in such occupations or professions under a license previously granted. . . .

It is universally held that it is competent for the legislature to prescribe qualifications for those who are to practice medicine and thus to assure that they shall possess the requisite character and learning . . . and the State may change the qualifications from time to time, making them more rigid. . . . It lies within the police power to require educational qualification of those already engaged in the practice of any profession.

*Dantzler*, 230 S.C. at 92–95, 94 S.E.2d at 186–88 (rejecting due process and equal protection challenges to act regulating practice of naturopathy) (citations and portions omitted).

Appellants cite *Medical Association of the State of Alabama v. Shoemake*, 656 So.2d 863 (Ala.Civ.App.1995), in support of their proposition that "other jurisdictions have determined this type of arrangement is an infringement on the practice of medicine."

Appellants' reliance on this case is misplaced. The *Shoemake* court, faced with a challenge to an administrative rule containing language similar to Section 40–45–110(A)(1), held only that physicians had standing to challenge the rule because it would affect their current practice of medicine and financial interests. The court explicitly declined to express any opinion on the merits of the physicians' challenge to the rule, noting the issue of standing involved only the physicians' "right of access to the [circuit] court, not the merits of the allegations." *Shoemake*, 656 So.2d at 868. The court did not determine the challenged rule improperly infringed on the practice of medicine.

■■■ As explained above, the federal Stark laws, the state Provider Self–Referral Act, and the state prohibition on physicians' employment of physical therapists all stem from the same motivation: to avoid conflicts of interest which are likely to lead to overuse of medical services by physicians who, for

their own financial gain rather than their patients' medical needs, refer patients to entities in which the physicians hold a financial interest. The Legislature's decision to enact Section 40–45–110(A)(1) was within its power to regulate the practices of medicine and physical therapy. Accordingly, we affirm the circuit court's ruling that the Board's decision to enforce Section 40–45–110(A)(1) does not improperly infringe upon physicians' statutory right to practice medicine.

## IV. EQUAL PROTECTION

Appellants contend Section 40–45–110(A)(1) violates the equal protection rights of physical therapists who wish to be employed by physicians who refer patients to them. We disagree.

No person shall be denied the equal protection of the laws. U.S. Const. amend. XIV, 1; S.C. Const. art. I, 3. To satisfy the equal protection clause, a classification must (1) bear a reasonable relation to the legislative purpose sought to be achieved, (2) members of the class must be treated alike under similar circumstances, and (3) the classification must rest on some rational basis. *Sunset Cay, LLC v. City of Folly Beach,* 357 S.C. 414, 428, 593 S.E.2d 462, 469 (2004); *Jenkins v. Meares,* 302 S.C. 142, 146–47, 394 S.E.2d 317, 319 (1990). The rational basis standard, not strict scrutiny, is applied in this case because the classification at issue does not affect a fundamental right and does not draw upon inherently suspect distinctions such as race, religion, or alienage. *See Sunset Cay,* 357 S.C. at 428–29, 593 S.E.2d at 469; *Fraternal Order of Police v. S.C. Dept. of Revenue,* 352 S.C. 420, 433, 574 S.E.2d 717, 723 (2002).

A legislative enactment will be sustained against constitutional attack if there is any reasonable hypothesis to support it. *Gary Concrete Products, Inc. v. Riley,* 285 S.C. 498, 504, 331 S.E.2d 335, 338–39 (1985) (citing *Thomas v. Spartanburg Ry., Gas Elec. Co.,* 100 S.C. 478, 85 S.E. 50 (1915)). The Court must give great deference to a legislative body's classification decisions because it presumably debated and weighed the advantages and disadvantages of the legislation at issue. Furthermore, "[t]he classification does not need to completely accomplish the legislative purpose with delicate

precision in order to survive a constitutional challenge." *Foster v. S.C. Dept. of Highways Pub. Transp.*, 306 S.C. 519, 526, 413 S.E.2d 31, 36 (1992).

"When the issue is the constitutionality of a statute, every presumption will be made in favor of its validity and no statute will be declared unconstitutional unless its invalidity appears so clearly as to leave no doubt that it conflicts with the constitution." *Gold v. S.C. Bd. of Chiropractic Examiners*, 271 S.C. 74, 78, 245 S.E.2d 117, 119–20 (1978). A "legislative act will not be declared unconstitutional unless its repugnance to the constitution is clear and beyond a reasonable doubt." *Joytime Distribs. and Amusement Co. v. State*, 338 S.C. 634, 640, 528 S.E.2d 647, 650 (1999).

Appellants assert that, as interpreted by the circuit court, the Legislature has created two classes: health care providers whom Appellants contend may receive intra-office referrals pursuant to the Provider Self–Referral Act (such as physicians, chiropractors, and massage therapists) and health care providers who may not receive such referrals (physical therapists). These similarly situated persons receive disparate treatment under Section 40–45–110(A)(1); thus, the statute violates the equal protection clause and must be struck down as unconstitutional.

A crucial step in the analysis of any equal protection issue is the identification of the pertinent class, *i.e.*, exactly who is included in the group of persons allegedly being treated differently under similar circumstances without any rational basis. We conclude the Legislature had rational basis for defining the pertinent classification in this instance as the class of physical therapists. It would not be appropriate to hold that the Legislature must, for purposes of self-referral issues, treat all health care providers and allied health professionals as similarly situated. The variations and nuances which pervade the complex practice of medicine and related professions in today's society counsel against the aggregation of different medical professionals into broadly based categories for purposes of analyzing an equal protection claim arising from a self-referral statute. Differences among the needs and wishes of various medical and allied health professions, as well as the overriding goal of ensuring public health, safety, and

welfare, have prompted state and federal lawmakers to enact numerous complicated statutes governing different professions, only a scant number of which are implicated in the present case.

In this case, the legislative purpose sought to be achieved presumably is the avoidance of overuse of physical therapy services by physicians who, for their own financial gain rather than their patients' medical needs, refer patients to therapists employed by the physician who will generate additional fees for the physician. The statutory prohibition on employment relationships between physicians and physical therapists bears a reasonable relation to that purpose. Members of the class of physical therapists are treated alike under similar circumstances, i.e., all physical therapists are barred from such employment relationships. Finally, the classification rests on the rational basis of avoiding overuse of physical therapy services and actual and potential conflicts of interest stemming from a physician's financial interest in the provision of therapy services. We defer to the Legislature's classification decision in this setting because it presumably debated and weighed the advantages and disadvantages of enacting a self-referral provision affecting physical therapists.

We affirm the circuit court's ruling that Section 40–45–110(A)(1) does not violate the equal protection rights of physical therapists who wish to be employed by physicians who refer patients to them.

## V. DUE PROCESS OF LAW

### A. SUBSTANTIVE DUE PROCESS

Appellants argue that Section 40–45–110(A)(1) violates the substantive due process rights of physical therapists who wish to be employed by physicians who refer patients to them. Appellants, relying on South Carolina Code Ann. § 40–1–10 (2001), assert the Legislature improperly exercised its police power by enacting this statute because it is not necessary for the preservation of the health, safety, and welfare of the public.[9] We disagree.

---

9. Section 40–1–10 provides:

 (A) The right of a person to engage in a lawful profession, trade, or occupation of choice is clearly protected by both the Constitution of

■ No person shall be deprived of life, liberty, or property without due process of law. U.S. Const. amend. XIV, 1; S.C. Const. art. I, 3. In order to prove a denial of substantive due process, a party must show that he was arbitrarily and capriciously deprived of a cognizable property interest rooted in state law. *Sunset Cay*, 357 S.C. at 430, 593 S.E.2d at 470; *Worsley Companies, Inc. v. Town of Mt. Pleasant*, 339 S.C. 51, 528 S.E.2d 657 (2000). A "legislative act will not be declared unconstitutional unless its repugnance to the constitution is clear and beyond a reasonable doubt." *Joytime Distribs. and Amusement Co.*, 338 S.C. at 640, 528 S.E.2d at 650.

■ We have held that the standard for reviewing all substantive due process challenges to state statutes, including economic and social welfare legislation, is whether the statute bears a reasonable relationship to any legitimate interest of government. *Sunset Cay*, 357 S.C. at 430, 593 S.E.2d at 470; *R.L. Jordan Co. v. Boardman Petroleum, Inc.*, 338 S.C. 475, 477, 527 S.E.2d 763, 765 (2000). "The purpose of the substantive due process clause is to prohibit government from engaging in arbitrary or wrongful acts regardless of the fairness of the procedures used to implement them." *In re Treatment and Care of Luckabaugh*, 351 S.C. 122, 140, 568 S.E.2d 338, 347 (2002) (internal quotes omitted).

■■ "The right to hold specific employment and the right to follow a chosen profession free from unreasonable governmental interference come within the liberty and property interests protected by the Due Process Clause [of the Fourteenth Amendment]. The liberty interest at stake is the individual's freedom to practice his or her chosen profession; the property interest is the specific employment." *Brown v. S.C. State Bd. of Educ.*, 301 S.C. 326, 329, 391 S.E.2d 866, 867

the United States and the Constitution of the State of South Carolina. The State cannot abridge this right except as a reasonable exercise of its police powers when it is clearly found that abridgement is necessary for the preservation of the health, safety, and welfare of the public.

Subsections (B), (C), and (D) further clarify when state regulation is necessary and require the State to impose no greater regulation than necessary to fulfill the basic goals of preserving the health, safety, and welfare of the public.

(1990) (citing *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959)); *Baird v. Charleston County*, 333 S.C. 519, 537, 511 S.E.2d 69, 79 (1999) (recognizing same principle); *Ezell v. Ritholz*, 188 S.C. 39, 46–49, 198 S.E. 419, 422–23 (1938) (discussing same principle). "It cannot be doubted that a man's trade or profession is his property." *Byrne's Adminstrs. v. Stewart's Adminstrs.*, 3 S.C. Eq. (3 Des. Eq.) 466, 479 (1812). Likewise, the practices of medicine and physical therapy by properly licensed individuals undoubtedly are cognizable property interests rooted in state law. *Dantzler v. Callison*, 230 S.C. 75, 92, 94 S.E.2d 177, 186 (1956) (stating "[t]here is no reasonable doubt that the rights of those who have been duly licensed to practice medicine or other professions are property rights of value which are entitled to protection").

 We conclude Section 40–45–110(A) does not violate Appellants' substantive due process rights. While Appellants possess a property right to practice their profession when duly licensed by their respective governing bodies, their exercise of that right is subject to the Legislature's police power to enact statutes and regulations aimed at enhancing the public welfare in the practice of medicine and related professions. *See Dantzler*, 230 S.C. at 92–95, 94 S.E.2d at 186–88. The statute prohibiting employment relationships between physicians and physical therapists bears a reasonable relationship to a legitimate interest of government, and the Legislature has not engaged in an arbitrary or wrongful act in enacting the statute.

## B. PROCEDURAL DUE PROCESS

Appellants contend the Board failed to provide them with procedural due process before announcing its modified interpretation of Section 40–45–110(A)(1) and intention of enforcing it in the near future. The Board failed to adequately announce its proposed plan to "summarily replace" its 1998 position statement and failed to give Appellants adequate notice and an opportunity to be heard on the issue. We disagree.

 The requirements of procedural due process, usually deemed to apply in a contested case or hearing which

affects an individual's property or liberty interest, generally include adequate notice, the opportunity to be heard at a meaningful time and in a meaningful way, the right to introduce evidence, the right to confront and cross-examine witnesses whose testimony is used to establish facts, and the right to meaningful judicial review. *In re Vora,* 354 S.C. 590, 595, 582 S.E.2d 413, 416 (2003); *S.C. Dept. of Soc. Servs. v. Wilson,* 352 S.C. 445, 452–53, 574 S.E.2d 730, 733–34 (2002); *Cameron Barkley Co. v. S.C. Procurement Review Panel,* 317 S.C. 437, 440, 454 S.E.2d 892, 894 (1995); *Brown,* 301 S.C. at 328–29, 391 S.E.2d at 867. Procedural due process requirements are not technical; no particular form of procedure is necessary. *In re Vora,* 354 S.C. at 595, 582 S.E.2d at 416. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Wilson,* 352 S.C. at 452, 574 S.E.2d at 733 (quoting *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494 (1972)). The requirements in a particular case depend on the importance of the interest involved and the circumstances under which the deprivation may occur. *S.C. Dept. of Soc. Servs. v. Beeks,* 325 S.C. 243, 246, 481 S.E.2d 703, 705 (1997).

 Appellants' argument is without merit because their right to procedural due process was not violated. The hearing at issue was not a contested case involving an individual licensee, but was a regularly scheduled meeting at which the Board discussed an issue of statutory interpretation and Board policy. The minutes of the meeting show that representatives of SCAPTA and physician-owned practices and licensees offered comments in support of their respective positions. After discussing the issue in executive session, the Board voted in open session to adopt the Attorney General's opinion and begin enforcing the statute following a ninety-day grace period in which physical therapists could restructure their practices. Appellants received the process they were due under these circumstances.

## CONCLUSION

We conclude the circuit court correctly interpreted Section 40–45–110(A)(1) to prohibit a physical therapist from working as an employee of a physician when the physician refers

patients to the physical therapist for services. We affirm the circuit court's ruling that the Board's endorsement of the Attorney General's opinion did not constitute improper rule-making. We affirm the circuit court's rulings that this interpretation of the statute did not improperly infringe upon physicians' statutory right to practice medicine, violate Appellants' equal protection rights, or violate Appellants' substantive and procedural due process rights.

**AFFIRMED.**

MOORE and WALLER, JJ., concur. TOAL, C.J., dissenting in a separate opinion in which Acting Justice ROGER M. YOUNG, concurs.

Chief Justice TOAL dissenting:

I respectfully dissent. Like the majority, I believe the statute does not infringe upon a physician's statutory right to practice medicine and that there has been no violation of the appellants' procedural due process rights. However, in my view, the plain language of S.C.Code Ann. § 40–45–110(A)(1) (2001) does not prohibit all employee-employer relationships between a physician and a physical therapist. Additionally, in my view, the South Carolina Board of Physical Therapy Examiners (Board) failed to comply with the Administrative Procedures Act (APA) in adopting the attorney general's opinion, thereby promulgating an invalid regulation. Further, in my opinion, the majority's interpretation of the statute would result in a violation of the plaintiffs' rights to equal protection and substantive due process. Accordingly, I would reverse the remainder of the issues on appeal.

## I. Interpretation of Section 40–45–110(A)(1)

The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the Legislature. *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000). In ascertaining the intent of the Legislature, a court should not focus on any single section or provision but should consider the language of the statute as a whole. *Mid–State Auto Auction of Lexington, Inc. v. Altman*, 324 S.C. 65, 69, 476 S.E.2d 690, 692 (1996). When a statute's terms are clear and unambiguous on their face, there is no room for statutory

construction and courts are required to apply them according to their literal meaning. *Carolina Power & Light Co. v. City of Bennettsville*, 314 S.C. 137, 139, 442 S.E.2d 177, 179 (1994).

Where the plain and ordinary meaning of the words used in a statute would lead to a result so plainly absurd that it could not possibly have been intended by the legislature or would defeat the plain legislative intention, the courts will reject the literal import of those words. *Kiriakides v. United Artists Commc'n, Inc.*, 312, S.C. 271, 275, 312 S.C. 271, 440 S.E.2d 364, 366 (1994) (internal citations omitted). If possible, the court will construe the statute so as to escape the absurdity and carry the intention into effect. *Id.* Further, where the statute contains an ambiguity, the court may look to other statutes dealing with the same subject matter, or *in pari material*, and construed them together, if possible, to produce a single harmonious result. *Joiner v. Rivas*, 342 S.C. 102, 536 S.E.2d 372 (2000).

Pursuant to the statute, the Board may take adverse action against any physical therapist who

requests, receives, participates, or engages directly or indirectly in the dividing, transferring, assigning, rebating, or refunding of fees received for professional services or profits by means of a credit or other valuable consideration including, but not limited to, wages, an unearned commission, discount, or gratuity with a person who referred a patient, or with a relative or business associate of the referring person.

S.C.Code Ann. § 40–45–110(A)(1). In my view, the majority misinterprets § 40–45–110(A)(1) to prohibit all employer-employee relationships between physicians and physical therapists. The majority finds that the legislature intended to prohibit physician-physical therapist employment relationships in order to prevent conflicts of interests and misuse of government-sponsored health care plans. However, this result would be absurd when viewed in relation to the other legislation related to this same purpose. Additionally, it is illogical that the legislature would intend to prohibit these relationships, while placing no restrictions on employment relationships between physicians and other health care providers. In my opinion, the more accurate interpretation of the statute would only prohibit a referral-for-pay situation. I believe the statute

can be interpreted in a way which would give effect to all words of the statute and avoid the result proposed by the majority.

First, assuming that the meaning of the statute turns on the definition of "wage", in my opinion, the majority extends the plain meaning of the word. The majority would find that the use of the word "wages" clearly demonstrates that the legislature intended to prohibit all employer-employee relationships between physicians and physical therapists. However, in my view, the use of this term, in its plain and ordinary use, would not prohibit all types of employment relationships.

The term "wage" is defined as "a pledge or payment of usually monetary remuneration by an employer especially for labor or services usually according to contract and on an hourly, daily, or piecework basis." *Webster's Third New International Dictionary*, 2568–69 (2002). In my opinion, the legislature's use of the word "wages" is indicative of their desire to prohibit only those payments received directly for work done on specific patients referred to the physical therapist; in other words, a referral-for-pay arrangement. In my view, this interpretation of the statute comports with the legislative purpose of protecting consumers as well as government-sponsored health care programs from conflicts of interest and potential misuse of medical services. Additionally, in my opinion, when the term "wages" is read in conjunction with the other listed descriptors of valuable consideration—unearned commission, discount, or gratuity [10]—the statute reflects the legislative intention to ban only those types of payments which occur on a piecemeal or individual referral basis. [11]

---

10. "Commission" is defined as "a fee paid to an agent or employee for transacting a piece of business or performing a service; especially a percentage of the money received from a total paid to the agent responsible for the business." *Webster's Third New International Dictionary*, 457 (2002). "Discount" means "an abatement or reduction made from the gross amount or value of anything." *Id.* at 646. "Gratuity" is defined as a tip or "something given voluntarily or over and above what is due usually in return for or in anticipation of some service." *Id.* at 992. In my view, these words describe payments which are made for individual transactions or services.

11. Conversely, the term "salary" is defined as "fixed compensation paid regularly (as by the year, quarter, month, or week) for services ...—

Additionally, in my opinion, the statute itself is indicative of the legislative intention to regulate the ethical practices of physical therapists rather than prohibit specific employment arrangements. Within subsection A of the statute, a physical therapist may also be subject to adverse actions by the Board if the physical therapist practices any service other than physical therapy, treats a patient without the requisite referral from a physician, assists another in the unauthorized practice of physical therapy, or changes patient care instructions. S.C.Code Ann. § 40–45–110(A). In my view, considering the other provisions of the statute, subsection (A)(1) was enacted to prohibit the unethical behavior of receiving or giving illegal kickbacks and participating in referral-for-pay arrangements.

Further, in my view, the statute is at least susceptible to two reasonable interpretations, making the statute ambiguous.[12] Accordingly, in my opinion, the majority inappropriately dismisses the importance of the other existing statutes enacted to prevent abuse and misuse of health care services and government-sponsored health care plans in its analysis. In looking at the other pertinent statutes, the Provider Self–Referral Act, federal Anti–Kickback statutes, and the federal Stark laws are all instructive of the legislative intention in enacting § 40–45–110(A)(1).

The Provider Self–Referral Act provides that the prohibitions on referrals are inapplicable to "an investment interest where the healthcare professional directly provides the health care services within the entity or will be personally involved in the provision, supervision, or direction of care to the referred patient." S.C.Code Ann. § 44–113–30(A)(1) (2002). The federal Anti–Kickback statutes provide both criminal and civil

---

often distinguished from wage." *Id.* at 2003. In my view, this term more accurately describes the dynamics of a bona fide employment relationship between a physician and a physical therapist in which the physical therapist receives a fixed salary unrelated to the number of patients who receive services. In my opinion, the legislature did not intend to prohibit these types of relationships, where compensation is unrelated to the referral.

**12.** Because the term "wages" is not defined, it is, at a minimum, ambiguous as demonstrated by the two different views advanced by the majority opinion and my dissent.

penalties for misusing federal health care programs by making false claims and illegal kickbacks. 42 U.S.C.A. §§ 1320a–7a to 7d (2003 & Supp.2005). Moreover, the Anti–Kickback statutes exempt bona fide employment relationships from the types of remuneration prohibited by the statutes. 42 C.F.R. § 1001.952(i) (2005). Further, the federal Stark laws create an exception to the self-referral statute for payments made by an employer to a physician in a bona fide employment relationship. 42 U.S.C.A. § 1395nn(e)(2) (Supp.2005).

In my view, these statutes were enacted to prevent health care providers from profiting on the basis of referrals, which is exactly the same reason the majority proposes for the enactment of § 40–45–110(A)(1). Viewing § 40–45–110(A)(1) in conjunction with these statutes, in my view, the more reasonable interpretation of the statute would prohibit only "sham" employment relationships where the physician and physical therapist are participating in a referral-for-pay arrangement.

Finally, in my opinion, had the legislature intended to prohibit employment relationships between physicians and physical therapists, they could have easily stated that intention in clear explicit terms. *See Broadhurst v. City of Myrtle Beach Election Comm'n,* 342 S.C. 373, 385, 537 S.E.2d 543, 549 (2000); *Williams v. Williams,* 335 S.C. 386, 390, 517 S.E.2d 689, 691 (1999); *Ray Bell Const. Co., Inc. v. School Dist. Of Greenville County,* 331 S.C. 19, 30, 501 S.E.2d 725, 731 (1998). Several statutes throughout the Code contain employment prohibitions. *See* S.C.Code Ann. § 38–46–60(B) (2002); *and* S.C.Code Ann. § 41–29–90 (2002). I find the legislature's failure to explicitly prohibit these relationships particularly instructive, especially in light of the fact that the Code contains no other employment restrictions regarding health care providers.

Accordingly, I would reverse the lower court's finding that § 40–45–110(A)(1) prohibits all employer-employee relationships between physical therapists and physicians. Instead, I would give the statute the more reasonable and logical reading and hold that the statute prohibits all arrangements in which the physical therapist participates in a referral-for pay situation.

## II. Board's Failure to Comply with the APA

In my view, the Board violated the APA by adopting the attorney general's opinion without promulgating it as a regulation. Whether an agency proceeding creates a regulation or simply announces a general policy statement depends on whether the agency action establishes a "binding norm." *Home Health Serv., Inc. v. South Carolina Tax Comm'n*, 312 S.C. 324, 328, 440 S.E.2d 375, 378 (1994).

> The key inquiry, therefore, is the extent to which the challenged policy leaves the agency free to exercise its discretion to follow or not to follow that general policy in an individual case, or on the other hand, whether the policy so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion. As long as the agency remains free to consider the individual facts in the various cases that arise, then the agency action in question has not established a binding norm.

*Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1377 (11th Cir.1983) (internal citations omitted). If the agency action is a binding norm, the action must be promulgated as a regulation under the rule-making provisions of the APA. *Home Health Serv., Inc.*, 312 S.C. at 329, 440 S.E.2d at 378. "When there is a close question whether a pronouncement is a policy statement or regulation, the [agency] should promulgate the ruling as a regulation in compliance with the APA." *Id.*

In my opinion, the Board promulgated an invalid regulation because they failed to comply with the rule-making provisions of the APA in adopting the attorney general's opinion. Unlike the majority, I would find that the Board's actions constitute a binding norm, or at the very least constitute a close question which should have been promulgated as a regulation.

The majority finds that by endorsing the attorney general's opinion, the Board did not enact a binding norm because "[t]he opinion merely sets forth the legal reasoning and authority . . . used to interpret the statute." However, in my view, the majority overlooks the fact that the statute is only permissive, while the Board's statement adopts a mandatory stance on the issue. Under the attorney general's opinion, the Board will have no discretion as to when discipline is appropriate. Addi-

tionally, the attorney general's opinion details the type of relationship which should be considered an employment relationship subject to the statute. Before the adoption of the attorney general's opinion, the Board was free to determine what situations qualified as an impermissible transfer or sharing of fees in the form of wages. After the adoption of the opinion, the Board must now presume any employment relationship in which the employer physician refers patients to the employee physical therapist is one that is prohibited by the statute, regardless of whether or not the physical therapist actually shares any portion of the fee charged to the patient. In my view, the agency is not "free to exercise its discretion to follow or not to follow that general policy in an individual case," but instead has created a situation in which "one need only determine whether a given case is within the rule's criterion." This is the very definition of a binding norm. Accordingly, in my opinion, the Board should have complied with the rulemaking provisions of the APA.

For that reason, I would reverse the lower court and find the Board's actions constitute an invalid regulation that is null and void for failure to comply with the rule-making provisions of the APA.

### III. Equal Protection

Additionally, in my view, the majority's interpretation of § 40–45–110(A)(1) would lead to an equal protect violation. The requirements of equal protection are met if: (1) the classification bears a reasonable relationship to the legislative purpose sought to be effected; (2) the members of the class are treated alike under similar circumstances; and (3) the classification rests on a reasonable basis. *Hanvey v. Oconee Mem'l Hosp.*, 308 S.C. 1, 5, 416 S.E.2d 623, 625 (1992). "While the General Assembly has the power in passing legislation to make a classification of its citizens, the constitutional guaranty of equal protection of the law requires that all members of a class be treated alike under similar circumstances and conditions, and that any classification cannot be arbitrary but must bear a reasonable relation to the legislative purpose sought to be effected." *Broome v. Truluck*, 270 S.C. 227, 230, 241 S.E.2d 739 (1978).

The majority concludes that it would be inappropriate to hold that the legislature must treat all health care providers and allied health professionals as similarly situated for purposes of self-referral issues. I disagree. In my view, this is precisely the type of situation in which the legislature should treat all health care providers and allied health professionals as similarly situated. Unlike the majority, I would find that the classification has no reasonable relation to the types of variations and nuances of the medical profession which would necessitate a distinction between physical therapist and all other health care professionals. Although I would agree that the separate classification of physical therapists may be appropriate in other situations, I find it difficult to envision any aspect of physical therapy which is so different from other health care services that it warrants separate classification for self-referral purposes.

In my opinion, there is no reasonable relationship between the legislative purpose and the separate classification of physical therapists apart from other health providers in this case. In my view, although it is reasonable that the legislature enacted this statute to protect consumers as well as government-sponsored health care programs from conflicts of interest and potential misuse of medical services, neither the Respondents nor the majority articulate any plausible reason why physical therapists are being specifically singled out for disparate treatment for self-referral purposes. Although it is possible for physicians to overuse physical therapy services, physicians could just as easily overuse the services of all other health care providers. Accordingly, in my view, the statute treats physical therapists differently than other health care providers who are similarly situated for purposes of this statute; and therefore, the statute's classification is arbitrary and violative of the equal protection rights of physical therapists. *See Hanvey,* 308 S.C. at 5, 416 S.E.2d at 625–26 (holding that there is no rational basis for distinguishing between charitable hospitals and other medical providers of goods and services, such as the Red Cross, for the purpose of limiting the liability of health care providers under S.C.Code Ann. § 44–7–50 (1976)); *and Broome,* 270 S.C. at 230, 241 S.E.2d at 740 (finding that no rational basis appears for making a distinction between architects, engineers, and con-

tractors, on one hand, and owners and manufacturers, on the other, for the purpose of establishing a statute of limitations to recover damages for any deficiency in design of an improvement to realty under S.C.Code Ann. § 15-3-670 (1976)).

## IV. Substantive Due Process

Finally, I believe the statute, as interpreted by the majority, violates the substantive due process rights of the physical therapists. Substantive due process protects a person from being deprived of life, liberty, or property for arbitrary reasons. *Worsley Co., Inc. v. Town of Mount Pleasant,* 339 S.C. 51, 56, 528 S.E.2d 657, 660 (2000). In order to claim a denial of substantive due process, a plaintiff must show that he was arbitrarily and capriciously deprived of a cognizable property interest rooted in state law. *Id.*

Given the majority's interpretation, I believe § 40-45-110(A)(1) acts as an arbitrary prohibition of physical therapists' employment relationships with physicians. It is well established that the practice of medicine or other professions by a properly licensed person is a cognizable property interest. *See Dantzler v. Callison,* 230 S.C. 75, 92, 94 S.E.2d 177, 186 (1956). While the State has a right to regulate the profession, "the State cannot abridge this right except as a reasonable exercise of its police powers when it is clearly found that abridgement is necessary for the preservation of the health, safety, and welfare of the public." *See* S.C.Code Ann. § 40-1-10 (2001). Although the legislature may have a legitimate interest in protecting consumers as well as government-sponsored health care programs from conflicts of interest and potential misuse of medical services, in my opinion, § 40-45-110(A)(1) imposes an arbitrary employment restriction upon physical therapists while preserving those employment relationships for all other health care providers and allied health professionals.

For the foregoing reasons, I respectfully dissent.

Acting Justice ROGER M. YOUNG, concurs.